IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

BRUCE A. HESSEVICK,                                    Civ No. 06-528 AA

          Plaintiff,                                  OPINION AND ORDER

          v.

MICHAEL J. ASTRUE,[1]
          Commissioner of Social Security,

          Defendant.

---

AIKEN, Judge:

      Plaintiff Bruce Hessevick ("Hessevick"), brings this action pursuant to the Social Security Act, 42 USC § 405(g), to obtain judicial review of a final decision of the Commissioner of the Social Security Administration ("Commissioner") denying his claim for Disability Insurance Benefits and Supplemental Security Income benefits. For the reasons set forth below, the decision of the Commissioner is remanded for further proceedings consistent with this opinion.

---

[1] On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security. He is substituted as the defendant in this action pursuant to Fed. R. Civ. P. 25(d)(1) and 20 U.S.C. section 405(g).

1 - OPINION AND ORDER

## PROCEDURAL BACKGROUND

Hessevick filed an application for benefits on April 8, 2003, alleging disability since September 16, 2002, due to back and neck pain and mental disorders. Her[2] application was denied initially and upon reconsideration. On April 20, 2005, a hearing was held before an Administrative Law Judge ("ALJ"). In a decision dated May 24, 2005, the ALJ found Hessevick was not entitled to benefits. On February 2, 2006, the Appeals Council denied Hessevick's request for review, making the ALJ's decision the final decision of the Commissioner. Hessevick now seeks judicial review of the Commissioner's decision.

## STANDARDS

A claimant is disabled if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 USC § 423(d)(1)(A). The initial burden of proof rests upon the claimant to establish his or her disability. *Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir. 1995), *cert. denied*, 517 US 1122 (1996). The Commissioner bears the burden of developing the record. *DeLorme v. Sullivan*, 924 F.2d 841, 849 (9th Cir. 1991).

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole. 42 USC § 405(g); *see also Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Andrews*, 53 F.3d at 1039. The

---

[2] Plaintiff Hessevick, an anatomical male, identifies as a female and uses the first name "Karen." At her request, the court shall refer to her in the feminine.

court must weigh all of the evidence, whether it supports or detracts from the Commissioner's decision. *Martinez v. Heckler*, 807 F.2d 771, 772 (9th Cir. 1986). The Commissioner's decision must be upheld, however, if "the evidence is susceptible to more than one rational interpretation." *Andrews*, 53 F.3d at 1039-40.

## DISABILITY ANALYSIS

The ALJ engages in a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act. 20 CFR §§ 404.1520, 416.920. Below is a summary of the five steps, which also are described in *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999):

Step One. The Commissioner determines whether claimant is engaged in substantial gainful activity. If so, claimant is not disabled. If claimant is not engaged in substantial gainful activity, the Commissioner proceeds to evaluate claimant's case under step two. 20 CFR §§ 404.1520(b), 416.920(b).

Step Two. The Commissioner determines whether claimant has one or more severe impairments. If not, claimant is not disabled. If claimant has a severe impairment, the Commissioner proceeds to evaluate claimant's case under step three. 20 CFR §§ 404.1520(c), 416.920(c).

Step Three. Disability cannot be based solely on a severe impairment; therefore, the Commissioner next determines whether claimant's impairment "meets or equals" one of the impairments listed in the Social Security Administration ("SSA") regulations, 20 CFR Part 404, Subpart P, Appendix 1. If so, claimant is disabled. If claimant's impairment does not meet or equal one listed in the regulations, the Commissioner's evaluation of claimant's case proceeds under step four. 20 CFR §§ 404.1520(d), 416.920(d).

3 - OPINION AND ORDER

Step Four. The Commissioner determines whether claimant is able to perform work he or she has done in the past. If so, claimant is not disabled. If claimant demonstrates he or she cannot do work performed in the past, the Commissioner's evaluation of claimant's case proceeds under step five. 20 CFR §§ 404.1520(e), 416.920(e).

Step Five. The Commissioner determines whether claimant is able to do any other work. If not, claimant is disabled. If the Commissioner finds claimant is able to do other work, the Commissioner must show a significant number of jobs exist in the national economy that claimant can do. The Commissioner may satisfy this burden through the testimony of a vocational expert ("VE") or by reference to the Medical-Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2. If the Commissioner demonstrates a significant number of jobs exist in the national economy that claimant can do, claimant is not disabled. If the Commissioner does not meet this burden, claimant is disabled. 20 CFR §§ 404.1520(f)(1), 416.920(f)(1).

At steps one through four, the burden of proof is on the claimant. *Tackett*, 180 F.3d at 1098. At step five, the burden shifts to the Commissioner to show that the claimant can perform jobs that exist in significant numbers in the national economy. *Id*

## ALJ's DECISION

At step one, the ALJ found Hessevick had not engaged in substantial gainful activity since the alleged onset of disability on September 16, 2002. This finding is not in dispute.

At step two, the ALJ found Hessevick had the medically determinable severe impairments of degenerative disc disease of the cervical spine, diabetes mellitus, and spasms of unknown etiology. This finding is in dispute.

At step three, the ALJ found that Hessevick's impairments did not meet or medically equal

a listed impairment. This finding is in dispute.

The ALJ determined that Hessevick retained the residual functional capacity ("RFC") to lift and carry up to 20 pounds on occasion and 10 pounds frequently, to sit for six hours, and stand or walk for six hours in an eight hour workday, but required the ability to change positions for a few minutes every hour. In addition, Hessevick could occasionally climb ladders, ropes and scaffolds, and she should avoid hazards. This finding is in dispute.

At step four, the ALJ found that Hessevick was able to perform her past relevant work as a sales manager, real estate salesperson, gutter salesperson, real estate broker, or auto salesperson. Accordingly, the ALJ found that Hessevick was not disabled. However, the ALJ continued to step five.

At step five, the ALJ determined that, with her RFC and an additional limitation of working without public contact, Hessevick retained the ability to perform work as a telemarketer. As a result, the ALJ found Hessevick not disabled within the meaning of the Act.

## FACTUAL BACKGROUND

Hessevick was born in 1946, and was 59 years old at the time of the hearing decision. Tr. 29.[3] She has a high school education, and completed nearly four years of college. Tr. 89. She served in the United States military in Vietnam, and has worked as a sales manager, real estate sales agent, real estate broker and automobiles salesperson. Since January 2005, she has worked as a dog breeder, but not at gainful levels. Tr. 568, 634.

The medical records in this case accurately set out Hessevick's medical history as it relates

---

[3] Citations are to the page(s) indicated in the official transcript of the record filed with the Commissioner's Answer.

to her claim for benefits. The court has carefully reviewed the extensive medical record, and the parties are familiar with it. Accordingly, the details of those medical records will be set out below only as they are relevant to the issues before the court.

## DISCUSSION

Hessevick contends that the ALJ erred by: (1) failing to find a severe mental impairment at step two; (2) failing to consider post-hearing evidence; (3) finding her not fully credible; (4) improperly rejecting the opinion of a treating physician; and (5) failing to find that her impairments meet or equal in severity an impairment listed in the regulations. Because the first two assertions are dispositive, the court will not address the latter arguments.

A. Step Two Determination

At step two, the ALJ must determine whether the claimant has produced objective medical evidence of a "severe" impairment. *Bowen v. Yuckert,* 482 US 137, 140-41 (1987). The Social Security Regulations and Rulings, as well as case law applying them, discuss the step two severity determination in terms of what is "not severe." According to the regulations, "an impairment is not severe if it does not significantly limit [the claimant's] physical ability to do basic work activities." 20 CFR § 404.1521(a). Basic work activities are "abilities and aptitudes necessary to do most jobs, including, for example, walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling." 20 CFR § 404.1521(b).

The step two inquiry is a *de minimis* screening device to dispose of groundless claims. *Yuckert,* 482 US at 153-54. An impairment or combination of impairments can be found "not severe" only if the evidence establishes a slight abnormality that has "no more than a minimal effect on an individual's ability to work." *See* SSR 85-28; *Yuckert v. Bowen,* 841 F.2d 303, 306 (9th Cir.

6 - OPINION AND ORDER

1988) (adopting SSR 85-28).

A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, and cannot be established on the basis of a claimant's symptoms alone. 20 CFR § 404.1508.

Hessevick contends that the ALJ erred by failing to find that she had severe mental impairments at step two. In so finding, the ALJ relied on the opinion of examining psychologist Gary Sacks, Ph.D., who, in February 2004, diagnosed Gender Identity Disorder ("GID"), Major Depressive Disorder ("MDD") and somatoform disorder, but concluded that Hessevick's "employment difficulties primarily result from physical problems." Tr. 21-22; 466. The ALJ also cited the opinion of Hessevick's treating physician, Sara Becker M.D. In August 2003, Dr. Becker found a "fairly good range of motion" and "no demonstrable neurologic deficits, although she still has this somewhat peculiar spasming that occurs intermittently." Tr. 480. Dr. Becker opined that Hessevick was medically stationary, and that she did not have "any long-term disability or residual although it is hard to know what to make of the spasms." *Id.*

Accordingly, the ALJ found:

> The claimant has a depressive disorder, somatoform disorder and gender identity disorder. These impairments result in mild restriction of activities of daily living. The claimant functions independently. An evaluating psychologist noted that although she repeatedly emphasized a complete inability to care for herself, in response to specific questions she reported that she grocery shops, prepares meals, cares for her pets, dresses, bathes, and pays the bills [citation omitted]. The claimant has mild difficulties in maintaining social functioning. Vocational rehabilitation records reveal the claimant did very well when she attempted phone sales jobs but quit because she did not like the management techniques used to motivate people to work harder [citation omitted]. The claimant has indicated she feels she could work in real estate but that no one will hire her because of spasms [citation omitted]. The claimant has mild difficulties in maintaining concentration, persistence or pace. Cognitive functioning is intact [citation omitted]. She has continued to build a dog

>  breeding business through vocational rehabilitation [citation omitted]. The claimant
>  does not experience episodes of decompensation of extended duration. The claimant's
>  mental impairments do not result in significant work-related functional limitations.
>  They are not severe impairments.

Tr. 22-23.

Hessevick argues that the ALJ failed to give adequate weight to the evidence of record, particularly the opinion of treating psychologist Linda R. Gonzales, Ph.D.

Dr. Gonzales treated Hessevick for about seven months commencing in June 2001. She diagnosed MDD and symptoms of Post Traumatic Stress Disorder, and assessed a Global Assessment of Functioning ("GAF") score of 60[4]. Dr. Gonzales's opinion was supported by a valid MMPI-2. Dr. Gonzales noted ongoing suicidal ideation, sleep disruption, social introversion, and unstable moods. Tr. 350, 285, 329. In January 2002 Dr. Gonzales reported that Hessevick's depression had stabilized since she began dressing as a female in December 2001, and continued to assess a GAF score of 60. Tr. 196, 258-65. Dr. Gonzales noted that Hessevick's identity disorder had caused her "significant emotional suffering and impairment in social functioning." Tr. 264.

Dr. Gonzales' notes can be read to assert that, in January 2002, Hessevick had a significant impairment in social functioning, not a mild impairment, as found by the ALJ. This interpretation is consistent with Gonzales' GAF assessment of 60, which reflects "moderate" social difficulties.

---

[4]  2 The GAF scale is a tool for "reporting the clinician's judgment of the individual's overall level of functioning." American Psychiatric Ass'n., Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 2000). It is essentially a scale of zero to 100 in which the clinician considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness," not including impairments in functioning due to physical or environmental limitations. *Id* at 34. A Global Assessment of Functioning ("GAF") score between 51 and 60 indicates "Moderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Id* at 32.

8 - OPINION AND ORDER

An ALJ may reject the uncontradicted opinion of a treating psychologist only for "clear and convincing" reasons supported by substantial evidence in the record. *Lester v. Chater,* 81 F.3d 821, 830 (9th Cir. 1995). The opinion of an treating psychologist, even if contradicted by another psychologist, can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record. *Id.* (citing *Andrews v. Shalala,* 53 F.3d 1035, 1043 (9th Cir. 1995)).

The ALJ noted the contradicting opinions of the examining psychologist Sacks and the conclusory opinion of no physical disability offered by the treating physician Becker. However, Dr. Becker treated Hessevick for physical complaints only, and Dr. Sacks' opinion was based upon a review of the record and a single interview. These are not specific and legitimate reasons to reject Dr. Gonzales's opinion. Furthermore, substantial evidence supports Dr. Gonzales's opinion that Hessevick had significant mental impairments.

On January 31, 2002, Hessevick's care was transferred from Gonzales to Bryan T. Neff, L.C.S.W. Neff treated Hessevick from January 2002 to at least April 2005. All of his chart notes are additionally signed by Mark Helfand, M.D.

Between February and April 2002 Neff reported that Hessevick appeared to be stable. Tr. 251-56. In May 2002 Hessevick was in a motor vehicle accident. In June 2002 Neff noted that she was active in the transgender community, had resumed her sales job, and was working on her home. Tr. 251. On August 30, 2002, Hessevick lost her job, and on September 16, 2002, she was in another motor vehicle accident, resulting in whiplash injuries to her upper back and neck. Tr. 202. Neff noted increased spasms and pain and a "period of low mood" in October 2002. Tr. 238. Hessevick showed up to see Neff, unscheduled, on October 25, 2002, reporting increased depression and back

9 - OPINION AND ORDER

spasms. *Id.* On November 20, 2002, Hessevick reported increasing depression and suicidal ideation. Tr. 228.

On December 3, 2002, Hessevick again visited Neff without an appointment, reporting increasing depression, back spasms, and an impaired gait. She was contemplating overdosing on muscle relaxants. Tr. 227. In February and March 2003 Hessevick continued to report increasing symptoms of depression. Tr. 224. Hessevick reported that she could not find work because of the spasms, but Neff noted that she "refuses to consider disability." Tr. 222. Neff assessed a "[s]table mood overall. Determined stance, despite indications that her current pain and spasms may be disabling." *Id.*

On April 23, 2003, Hessevick was in a third motor vehicle accident. On April 30, 2003, she reported to Neff that her mood was stable with "periods of hopelessness." Tr. 215.

On June 19, 2003, Hessevick reported that she was homeless and "feeling like a failure and wanting to die." Tr. 426. Neff reported that, "Vet continues to struggle with severe stress. Vet has had several car accidents in the last year that have led to incapacitating pain and back spasms. She has tried a variety of jobs but either cannot keep them or even get her foot in the door. Vet is clearly trying to work, but at this time seems quite disabled–both from medical and MDD that is worsening. Vet is at risk for SA [suicide attempt]." *Id.* Hessevick reported that her pain and spasms were "incapacitating at times" in July 2003. Tr. 426. In August, she was in a "low mood w/ SI but no plans." Tr. 424.

She was evaluated at the Northwest Pain Network between October 8 and 16, 2003. Tr. 380-86. Cervical spine x-rays revealed degenerative disc disease most prominent at C4-5 and C5-6 with "a little sclerosis at the lower levels." Tr. 436. There was "significant limitation of motion in

10 - OPINION AND ORDER

flexion." *Id.* X-rays of the lumbar spine revealed limitation of motion and mild degenerative changes. Tr. 437. Gail Sakuma, Adult Nurse Practitioner, ("ANP"), examined Hessevick and diagnosed:

> 1. Depression.
> 2. Somatization disorder. She presents with vague physical complaints. Physical findings and strength testing of the above motor testing are not consistent with her reported level of dysfunction. Please refer to MMPI where there was noted to have somatization traits and lack of insight. Likelihood of anyone/procedure/medication impacting her pain will be minimal.
> 3. There is a question of secondary gain issues, applying for Social Security Disability.
> 4. Gender identity.

Tr. 383.

As part of the pain clinic evaluation Hessevick was examined by David W. Greaves, Ph.D. and Psychology Intern Mark G. Dillon, M.S. Tr. 384-86. They reported:

> Her score on the BDI indicated a moderate level of depressive symptoms. On the MHLC, her scores indicated that she tends to believe that chance events have the biggest impact on her health when compared to the potential impact that her own actions, or the actions of care providers, on her health. Results of the SF-36 indicated that she has difficulties with work, daily activities, and social activities due to physical and emotional problems, and feels fatigued much of the time. On the SF-36, the veteran also indicated that her health was "somewhat worse" than it was last year.

Tr. 385. They diagnosed pain condition, gender identity disorder, and major depressive disorder.

In January 2004, Hessevick reported increased symptoms of depression present most days of the week. She felt hopeless and helpless and experienced suicidal ideation. Tr. 467. She had poor concentration and decision making skills, hypersomnia, and loss of appetite. She reported severe back and leg spasms, and requested an evaluation for a walking aid. Neff assessed her GAF score at 45. *Id.*

The next record of treatment is the report of a movement disorder consultant, Molly Davis,

in April 2005, requested by the Veterans' Administration. Tr. 517-23. Ms. Davis reported:

> The differential diagnosis at this point includes myoclonis vs. a somatoform disorder, and several features of her presentation favor the latter; one of the witnessed events during the evaluation today appeared to be a sudden onset of an atonic spell, as opposed to muscle contractions. It should be emphasized that a conversion disorder is a neuropsychologic disorder with behavioral and neurologic consequences, and the patient is not willfully feigning her symptoms. Moreover, the diagnosis is one of exclusion, and it is very difficult to rule out an organic disorder conclusively.

Tr. 522. This report is also signed by Katherine Chung, M.D.

In March and April 2005 Hessevick reported that her depression was adequately controlled by her medication. Tr. 526, 524.

The final medical report in the record is dated August 3, 2005, several months after the hearing before the ALJ. This report was submitted to the Appeals Council, which apparently declined to consider it. David Gostnell, Ph.D., a Clinical Neuropsychologist, examined Hessevick at the request of Vocational Rehabilitation services. Tr. 606-20. He reviewed medical records and administered the following tests: Mini-Battery of Achievement; Personality Assessment Inventory; Rey Complex Figure Test; Wechsler Adult Intelligence Scale-III (WAIS-III); and Wechsler Memory Scale-III (WMS-III). Dr. Gostnell wrote:

> The extent to which her transgender condition interferes with personal and vocational functioning is not so clear. Although she does not consciously identify this as an issue, her social isolation and discomfort with public exposure is at least partially a function of this disorder. It is of interest that she was vocationally [competent] during the many years of her life in which she presented as a man. The etiology of her "tic" or "spasm" is difficult to ascertain and may be multifactorial. She clearly has well documented cervical spine pathology....In addition, however, psychological factors are likely to make a contribution to this symptom: personality testing reveals the presence of a somatoform process, and it appeared during the exam that the occurrence of these spasmodic events was affected by distractibility, suggesting an element of volitional control.
>
> The question of malingering or "secondary gain" has been raised to account for one

>or more of Ms. Hessevick's symptoms. A diagnosis of malingering means that the individual deliberately and consciously fabricates a symptom with the conscious goal of obtaining external benefit....In this context, it must be noted that she produced valid personality test results, with no evidence of deliberate exaggeration or embellishment of symptoms. Despite her memory complaints, her normal scores are evidence that she gave full effort to the testing. Her clinical profile did, however, reveal a somatoform configuration, which implies that physical symptoms are likely to have underlying psychological antecedents, e.g., psychological stress or anxiety may be converted into or may intensify physical symptoms, such as pain. A specific physical symptom may be the result of a hysterical conversion disorder, in which the symptom may be a symbolic manifestation of a specific underlying psychological process. These hypotheses appear much more reasonable in Ms. Hessevick's case than the suggestion of malingering. Although deeply inferential, and offered only as an alternative to the postulation of malingering, Ms. Hessevick's apparent neck spasms or tics may fulfill a psychological need to avoid public exposure, for which the underlying psychodynamic mechanism may be associated with her gender identity disorder.

Tr. 615.

Neff's chart notes reveal that by Hessevick's alleged onset date of September 16, 2002, she was experiencing substantial mental symptoms that were no longer adequately controlled by medication. By March 2003 Neff concluded that Hessevick's mental limitations precluded employment.

The ALJ noted some of the conversations Neff recorded, but offered no reason for disregarding his opinions. His observations, along with the reports of Drs. Greaves and Gostnell, support the opinion of Dr. Gonzales that Hessevick has a severe mental impairment, and these opinions can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record. *Matney v. Sullivan*, 981 F.2d 1016 (9th Cir. 1992). This is particularly true where, as here, the examining providers' opinions are supported by objective medical evidence in the form of testing, including MMPI-2, the Beck Depression Inventory, the MHLC, the Mini-Battery of Achievement, Personality Assessment Inventory, WAIS-II, and WMS-III.

13 - OPINION AND ORDER

Accordingly, the ALJ's conclusion that Hessevick's mental impairments are not severe is not supported by substantial evidence.

B. <u>Post-Hearing Evidence</u>

Dr. Gostnell's report was prepared after the hearing before the ALJ and submitted to the Appeals Council. Hessevick contends that it should be considered by the ALJ.

Remand for consideration of new evidence is appropriate when the evidence is material and the claimant establishes good cause for failure to submit the evidence during the administrative hearing. *Orteza v. Shalala,* 50 F.3d 748, 751 (9th Cir. 1995). The claimant must show that the new evidence is probative of her condition as it existed at the relevant time and has a reasonable possibility of changing the Commissioner's determination. *Booz v. Secretary,* 734 F.2d 1378, 1380 (9th Cir. 1984).

The record reflects that Hessevick began experiencing muscle spasms in the back in November 2000. Tr. 372. The spasms were described as "occasional dramatic jerking movements" by the time of her alleged onset date in September 2002. Tr. 202. In April 2005, prior to the hearing before the ALJ, movement disorder consultant Davis suggested that Hessevick might be suffering from a neuropsychologic conversion disorder. Tr. 517-522.

Dr. Gostnell's report is material and probative of Hessevick's condition at the relevant time. It has a reasonable possibility of changing the Commissioner's determination. The report did not exist at the time of the hearing before the ALJ, although the existence and etiology of Hessivick's mental limitations and spasms were at issue at the time of the hearing. Accordingly, the ALJ must consider Dr. Gostnell's report in evaluating Hessevick's limitations.

///

14 - OPINION AND ORDER

C. Remand For Further Proceedings

The decision whether to remand for further proceedings or for immediate payment of benefits is within the discretion of the court. *Harman v. Apfel,* 211 F.3d 1172, 1178 (9th Cir. 2000). The court's decision turns on the utility of further proceedings. A remand for an award of benefits is appropriate when no useful purpose would be served by further administrative proceedings or when the record has been fully developed and the evidence is not sufficient to support the Commissioner's decision. *Rodriguez v. Bowen,* 876 F.2d 759, 763 (9th Cir. 1989).

The Ninth Circuit has established a three-part test "for determining when evidence should be credited and an immediate award of benefits directed." *Harman v. Apfel,* 211 F.3d at 1178. The court should grant an immediate award of benefits when:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Id.* The second and third prongs of the test often merge into a single question: Whether the ALJ would have to award benefits if the case were remanded for further proceedings. *See id.* at 1178 n.2.

Even if the court credits as true the diagnoses and findings of the treating and examining physicians, it is not clear that Hessevick is entitled to benefits. Thus, this case is remanded to the Commissioner to reconsider steps three through five with appropriate consideration of Hessevick's mental impairments.

///

///

///

15 - OPINION AND ORDER

## CONCLUSION

The Commissioner's decision is remanded for further administrative proceedings consistent with this opinion and final judgment is entered pursuant to sentence six of 42 USC § 405(g).

IT IS SO ORDERED.

Dated this 2 day of ~~March~~ April, 2007.

*Ann Aiken*
ANN AIKEN
United States District Judge